## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RODNEY BURNS, | : | |
|      **Plaintiff,** | : | CIVIL ACTION |
| | : | |
|   **v.** | : | |
| | : | |
| PA DEPARTMENT OF | : | |
| CORRECTIONS, et al., | : | No. 05-3462 |
|      **Defendants.** | : | |

## MEMORANDUM

**Schiller, J.**                                                                                    **May 26, 2009**

      Plaintiff Rodney Burns brought this civil rights action, pursuant to 28 U.S.C. § 1983, against Pennsylvania Department of Corrections ("DOC") officials Donald Williamson, David DiGuglielmo, Thomas Dohman, Mary Canino, Robert S. Bitner, Tony Wolfe, Levi Hosband, and Frank Regan ("Defendants"). On February 6, 2007 this Court granted Defendants summary judgment on all of Plaintiff's claims. Plaintiff appealed, and the Third Circuit reversed and remanded the case on September 19, 2008. Presently before the Court are Defendants' second motion for summary judgment and Plaintiff's second motion for partial summary judgment. For the reasons that follow, Defendants' motion is granted in part and denied in part and Plaintiff's motion is granted in part and denied in part.

## I.     BACKGROUND

### A.     Factual Background[1]

---

    [1] Since the underlying facts of this case have not changed since the Court's February 6, 2007 Memorandum and Order, the Court largely restates the facts as presented in that opinion. It also adds, where appropriate, additional facts presented in the Third Circuit's opinion.

In February of 2005, Plaintiff was incarcerated in Housing Unit B ("B Block") at SCI Graterford, a Pennsylvania prison.  On February 10, 2005, an inmate named Charles Mobley was assaulted by another inmate, who threw scalding hot water on his face.  The attack occurred in the B Block "dayroom" area.  Mobley's burns were discovered four days later by Corrections Officer Angelina Rivera, who then notified her superiors.  Mobley was taken to the prison medical unit for treatment.  A nurse cleaned his burn, applied antibiotic ointment and administered a Tetanus shot.

Mobley subsequently identified his assailant as a resident of cell BA-1022.  Ricky Holmes, one of the two inmates in that cell, was placed in administrative custody with restricted cell status for four days while the incident was investigated.  The prison's Security Department later received two phone calls through a special hotline established to enable reliable inmates, who were selectively given the hotline number, to share confidential information.  Both callers stated that Holmes was not responsible for the incident and that Burns had thrown hot water on Mobley.  Defendant Thomas Dohman, Captain of Security at SCI Graterford, deemed this information credible because he recognized the callers' voices and had previously received reliable information from them.  On February 18, 2005, the same day Holmes was released from restricted cell status, Dohman interviewed Plaintiff.  Dohman concluded that Mobley, whom he described, from prior experience, as "semi-coherent" at times, had confused Holmes and Plaintiff, who look similar.  Dohman accused Plaintiff of committing the assault, but Plaintiff repeatedly denied any involvement in the incident.  Nonetheless, following the meeting with Dohman, Plaintiff was placed in administrative custody and transferred to the Restricted Housing Unit ("RHU") while the investigation continued.

Dohman issued a misconduct report on March 7, 2005, charging Plaintiff with assault.  The report stated that the charges were based on statements from two confidential informants, who saw

2

the assault and had given reliable information in the past, as well as information, which also implicated Plaintiff, given by other inmates to Lt. Abdul Ansari.  After placing Plaintiff in administrative custody, Dohman received an anonymous letter, which informed him that he had "the right man" and told him that Plaintiff had threatened to retaliate against Mobley.  Dohman believed that the letter was written by someone other than the two confidential informants who had called the hotline, but because it was anonymous he did not rely upon it in preparing the Misconduct Report.

After the report was issued, Plaintiff filed timely requests for Mobley to appear as a witness at his disciplinary hearing and for disclosure of the videotape of the incident.  On March 10, 2005, Burns appeared before Hearing Officer Mary Canino for his disciplinary hearing and pled not guilty.  Plaintiff also renewed his requests to view the videotape of the incident and for Canino to view the tape as well.  As a result of these requests, Canino continued the hearing.

On March 15, 2005, Canino held an *in camera* hearing regarding Plaintiff's disciplinary charges, during which she heard testimony from Dohman summarizing the statements of the two confidential informants.  Dohman did not identify the confidential informants during this hearing, nor did Canino obtain written statements or receive direct testimony from them.  Dohman informed Canino that the incident was not recorded on videotape.  Canino met with Mobley, who refused to testify at Plaintiff's disciplinary hearing or *in camera*.  She did not obtain a written statement from Mobley, nor did she ask him why he refused to testify at Plaintiff's disciplinary hearing or at an *in camera* hearing.  Later that day, Canino reconvened Plaintiff's disciplinary hearing and informed him that: (1) Mobley had refused to testify; (2) she found the confidential informants' statements, as described by Dohman, to be credible and reliable; and (3) the incident was not recorded on videotape.

3

Canino found Plaintiff guilty of the assault by a preponderance of the evidence and imposed the following sanctions: (1) 180 days of disciplinary confinement in the RHU; (2) loss of his prison job; and (3) assessment of his inmate account for any medical or other expenses incurred by Mobley as a result of the assault.  Plaintiff appealed his disciplinary conviction to the Program Review Committee, Superintendent David Diguglielmo, and Chief Hearing Examiner Robert Bitner.  All three administrative levels upheld the conviction after reviewing the same record, which included Canino's hearing report, Dohman's misconduct report, Plaintiff's inmate statement, and his witness request form.

A separation order was entered between Plaintiff and Mobley on April 4, 2005, as a result of Plaintiff's misconduct charge and to eliminate the possibility that Plaintiff would retaliate against Mobley upon release from disciplinary custody.  On September 6, 2005, Plaintiff was transferred to SCI Huntingdon.  As a result of his transfer, Plaintiff must now pay long-distance calling rates to talk to his family on the telephone and, to this point, has incurred $132.50 in calling card expenses.  In addition, Plaintiff has lost over $2,000 in wages because of losing his prison job in the SCI Graterford Clothing Plant and being placed in the "general labor" pool.  (Pls.' Mem. in Supp. of Second Mot. for Partial Summ. J. ["Pl.'s Second Mem."] at 24-25.)

**B.    Procedural History**

Plaintiff's Second Amended Complaint included seven claims for relief.  The first five claims asserted that Plaintiff's due process rights were breached by: (1) the denial of his right to call witnesses, (2) the Defendants' failure to turn over exculpatory evidence, (3) the denial of his right to present documentary evidence, (4) the Defendants' failure to adequately ensure the credibility and reliability of unnamed confidential informants, and (5) the Defendants' failure, on appeal, to

4

investigate the procedures utilized at his disciplinary hearing.  The sixth claim asserted that Plaintiff's disciplinary conviction was arbitrary and constitutionally impermissible, breaching his substantive due process rights.  The seventh and final claim contended that retaliatory actions taken against Plaintiff, for exercising his constitutional privilege against self incrimination, also breached his substantive due process rights.

On February 6, 2007, the Court denied Plaintiff's partial motion for summary judgment and granted Defendants summary judgment on all of Plaintiff's claims.  Finding that Plaintiff could not show the deprivation of a protected property interest, the Court concluded that he had failed, as a matter of law, to state a due process violation.  Plaintiff appealed this decision.  The Third Circuit's opinion focused on "whether a disciplinary conviction directing that an inmate's institutional account be assessed for medical or other expenses implicates a property interest sufficient to trigger the protections of procedural due process." *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 280 (3d Cir. 2008).  The court declared this "an issue of first impression across the courts of appeals." *Id.*  The court ultimately found that "the Department of Corrections acquired something similar to a money judgment by assessing [Plaintiff's] inmate account." *Id.* at 288.  This assessment, the court concluded, "constituted the deprivation of a protected property interest for purposes of procedural due process." *Id.* at 291.  Accordingly, this Court's previous order, which granted summary judgment to the Defendants on Plaintiff's procedural due process claims – on the grounds that Plaintiff failed to assert a protected property interest – was reversed and the matter remanded.[2]

_____

[2]  The Court's initial grant of summary judgment for the Defendants, as to the Second Amended Complaint's sixth and seventh claims for relief, which asserted breaches of substantive due process rights, remains unaffected by the Third Circuit's decision.  As the Third Circuit made clear, "the sole issue on appeal [was] whether the Department of Corrections impaired a protected property interest for purposes of procedural due process."  544 F.3d at 285.  Thus,

No money has been deducted from Plaintiff's inmate account. Moreover, the Department of Corrections has confirmed in writing that it will not be proceeding with the assessment of Plaintiff's account for any expenses related to the incident at issue in this case.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying those portions of the record that it believes illustrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes such a demonstration, the burden then shifts to the nonmovant, who must offer evidence that establishes a genuine issue of material fact that should proceed to trial. *Id.* at 324; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). When the moving party does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party demonstrates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable finder of fact to find for the nonmoving party at trial. *Anderson*, 477 U.S. at 248.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d

---

Plaintiff is not entitled to any relief in connection with these claims.

768, 777 (3d Cir. 1994).  Furthermore, a court may not make credibility determinations or weigh the evidence in making its determination. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S.133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

At the same time, to avoid summary judgment, "a nonmoving party must adduce more than a mere scintilla of evidence in its favor." *Williams v. Borough of W. Chester, Pa.,* 891 F.2d 458, 460 (3d Cir. 1989) (citing *Anderson*, 477 U.S. at 249).  Although credibility determinations remain the function of the jury, a judge considering a summary judgment motion by a defendant in a civil case "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *Anderson*, 477 U.S. at 252 (quoting *Improvement Co. v. Munson*, 81 U.S. 442, 448 (1871)).  The same standards apply to cross motions for summary judgment. *Appelmans v. City of Phila*, 826 F.2d 214, 216 (3d Cir. 1987); *see also Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001).

## III.    DISCUSSION

### A.    Plaintiff's Damages Claims

The Supreme Court's decision in *Harlow v. Fitzgerald* held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  457 U.S. 800, 818 (1982).  Furthermore,

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell* [v. *Forsyth*, 472 U.S.] 511, 535, n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson* v. *Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

*Hope v. Pelzer*,  536 U.S. 730, 739 (2002).

Under *Saucier v. Katz*, courts were required first to determine whether the facts of a case constitute a violation of a constitutional right and second to decide whether the right at issue is "clearly established."  533 U.S. 194, 201 (2001).  Recently, however, the Supreme Court rejected the sequence outlined in *Saucier. Pearson v. Callahan*, 129 S.Ct. 808, 817 (2009).  District and appellate court judges are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.  Here, because the Court decides that the right asserted was not clearly established, it need not determine whether a constitutional violation occurred.

The Third Circuit's opinion declared that "no court has either accepted or rejected the argument that Burns advances in this case.  It appears to be an issue of first impression across the courts of appeals." *Burns*, 544 F.3d at 286.  The lack of any "precedential authority addressing the right to security" compelled the court to rely upon other sources. *Id.* at 287.  Accordingly, the court drew on the work of legal philosophers like A.M. (Tony) Honoré and law and economics theory before concluding, in a 2-1 decision, that the "assessment of Burns' institutional account constituted the deprivation of a protected property interest for purposes of procedural due process." *Id.* at 291.

The Court agrees with Defendants that the right in question in this case cannot, by any means, be described as clearly established.  The Third Circuit's opinion made this clear by emphasizing the

dearth of authority on this subject. *Id.* at 287 ("[W]e are aware of no precedential authority addressing the right to security."); *see also id.* at 291 (Hardiman, J., dissenting) ("Today the Court finds a new property right for purposes of 42 U.S.C. § 1983: an inmate's right to 'security' in his prison account."). Plaintiff, however, contends that while the Third Circuit addressed an issue of first impression regarding the nature of the property interest in question, this served only as a *factual predicate* to the procedural due process rights at issue, which "have been clearly established for years, even decades." (Pl.'s Mem. of Law in Opp'n to Commonwealth Defs.' Second Mot. for Summ. J. ["Pl.'s Opp'n"] at 5.) According to Plaintiff, "the property interest at issue is clearly established, with the Third Circuit's recent decision addressing little more than a 'factual wrinkle' in that area of law." (*Id.*)

Plaintiff relies on *Hope v. Pelzer*, in which a prisoner argued that prison officials violated his Eight Amendment right to be free from cruel and unusual punishment when they handcuffed him to a hitching post. 536 U.S. at 733. According to Plaintiff, "The court found that this violated a 'clearly established' right despite having no precedent addressing use of a hitching post as cruel and unusual punishment." (Pl.'s Opp'n at 6 n.5.) Although no binding precedent directly dealt with the use of a hitching post, the Supreme Court concluded that the right was still clearly established given Eleventh Circuit precedent, a state department of corrections regulation, and a report from the Department of Justice on the constitutionality of the use of a hitching post. *Hope*, 536 U.S. at 741-42. Specifically, the Court noted binding precedent in which a court squarely held that "handcuffing inmates to the fence and to cells for long periods of time, . . . and forcing inmates to stand, sit or lie on crates, stumps, or otherwise maintain awkward positions for prolonged periods" violated the Eighth Amendment. *Id.* at 742 (citing *Gates v. Collier*, 501 F.2d 1291, 1306 (5th Cir. 1974)). The

9

Supreme Court found that "for the purpose of providing fair notice to reasonable officers administering punishment for past misconduct . . . [there is no] reason to draw a constitutional distinction between a practice of handcuffing an inmate to a fence for prolonged periods and handcuffing him to a hitching post for seven hours." 536 U.S. at 742. The Court concluded that the distinction between a fence and a hitching post constitutes the sort of "factual wrinkle" Plaintiff's argument against qualified immunity relies upon. The property interest recognized here does not present a wrinkle of similar subtlety.

The Court is unwilling to conclude that the writings of Professor Honoré offered the prison officials in this case fair warning equivalent to the pronouncements found in *Hope*. Nor does the Court agree with Plaintiff that prior case law holding that a prisoner has a property interest in an inmate account, or that an actual impairment of an account deprives an inmate of a property interest, sufficiently supports the conclusion that a mere assessment of an account impinges upon a clearly established property interest. (Pl.'s Opp'n at 7.) Such a conclusion would render unnecessary the Third Circuit's lengthy and scholarly analysis of this issue. Therefore, qualified immunity bars Plaintiff's ninth, tenth, and eleventh requests for relief, in the form of damages.[3] However, because qualified immunity does not preclude declaratory or injunctive relief, the Court must consider whether those remedies are warranted. *See Harris v. Pernsley*, 755 F.2d 338, 343 (3d Cir. 1985) ("The qualified immunity defense only applies, of course, to claims for money damages.")

---

[3] Qualified immunity also bars nominal damages. *See Hicks v. Feeney*, 850 F.2d 152, 155 n. 4 (3d Cir. 1988) ("Since [Plaintiff] was not entitled to any judgment while qualified immunity remained open he could not obtain damages, nominal or otherwise, on this record."); *see also Hopkins v. Saunders*, 199 F.3d 968, 978 (8th Cir. 1999) ("Several other circuits have also implicitly recognized the legal nature of nominal damages by finding them to be barred by qualified immunity.").

### B.      Plaintiff's Declaratory and Injunctive Relief Claims

#### 1.      Mootness and standing

Defendants contend that Plaintiff is not entitled to declaratory judgment, on the grounds that such relief "is inappropriate to adjudicate past conduct."  (Mem. of Law in Supp. of Defs.' Second Mot. for Summ. J. ["Defs.' Second Mem."] at 8 (citing *Corliss v. Obriend*, 200 F. App'x 80, 84 (3d Cir. 2006).)  They also assert, without any further analysis or discussion, that Plaintiff lacks standing for these claims, as the relief requested "would not remedy the alleged constitutional violation." (*Id.* (citing *Brown v. Fauver*, 819 F.2d 395, 400 (3d Cir. 1987).)  Contrary to Defendants' assertions, Plaintiff's requested declaratory relief would not solely adjudicate past conduct.  The Third Circuit's opinion analyzed and rejected the contention that Burns' due process claim was rendered moot by the Department's declaration that no steps would be taken to deduct any money from Burns' inmate account.  544 F.3d at 283.  The court found that a procedural due process violation, if one had occurred, would have been "complete at the time that his account was originally assessed."  *Id.* at 284.  As such, Burns' claims for relief related to this alleged violation could not be rendered moot by a letter sent more than three years after the original assessment.  The Third Circuit proceeded to note that, although the completed due process violation itself was sufficient to defeat a claim of mootness, "the timing and content of the Commonwealth's letter give us pause in considering whether '"there is no reasonable expectation . . . ' that the alleged violation will recur . . . ."'" *Id.* (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)).        As the Third Circuit declared in a separate case, "[w]hen there is a voluntary cessation of a policy, a claim will not be rendered moot if there remains the possibility that plaintiffs will be disadvantaged 'in the same fundamental way.'" *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d. Cir. 2003) (citing *Ne. Fla. Chapter*

11

*of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)).  Given that the Third Circuit's decision did not upset the hearing officer's determination of Plaintiff's guilt on the underlying misconduct charge, it remains possible that the Department, which voluntarily rescinded the assessment, might choose to reinstate this sanction.  In light of this reality, Plaintiff's requests for declaratory relief are not moot, nor does Plaintiff lack standing to bring these claims, which, if successful, could provide some relief.

2.      *The impact of the Third Circuit's opinion*

Under Plaintiff's interpretation of the Third Circuit's opinion, if the disciplinary proceedings failed to provide Plaintiff with the process to which his property right entitles him, this Court is empowered to grant relief relating not only to the protected property interest, but also to any results of the disciplinary proceedings that did not impinge directly upon the property interest.  (*See* Pl.'s Opp'n at 4 ("The assessment of his inmate account has never been advanced (by Burns) as a separate cause of action or claim for damages or any other relief, but merely as a trigger for the protections of procedural due process.")).  Defendants – who contend that "Plaintiff only appealed, and the Third Circuit opinion therefore only addressed, Plaintiff's procedural due process claim based upon his assertion that he was deprived of a protected property interest in his inmate account by the DOC's assessment on it" – more accurately characterize the effect of the Third Circuit's decision, and their interpretation better accords with the relevant, though scant, case law related to this issue.  (Defs.' Second Mem. at 3-4.)  Since the scope of the Third Circuit's decision necessarily shapes the legal issues this Court must address in determining what process and remedies, if any, Plaintiff is entitled to, the Court will address first the import of the appellate court's decision and the nature of the remedies available should a violation of procedural due process be found.

12

*Carey v. Piphus* is the leading case on compensatory damages in the context of a procedural due process violation.  435 U.S. 247 (1978).  The Supreme Court began its analysis of the scope of available damages by stating that "[r]ights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect."  *Id.* at 254.  The Court further declared that "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question . . . ."  *Id.* at 258-59.  In *Carey*, two public school students challenged their suspensions, which were handed down absent procedural due process.  The Court concluded that if the petitioners could prove on remand that the students would have been suspended even were a proper hearing to have been held, then the students would not be entitled to damages to compensate for any injuries caused by the suspensions.  *Id.* at 260.  In other words, if, assuming the students were afforded procedural due process, they nonetheless still would have been suspended, then the denial of due process "could not properly be viewed as the cause of the suspension."  *Id.*  In such a circumstance, "an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to respondents."  *Id.* (citing *United States v. Warden*, 545 F.2d 32 (1976)).

The Court finds the reasoning in *Carey* instructive.  Since any remedy to which Plaintiff is entitled must be tailored to his protected property right (of security in his prison account), he cannot recover for harms unrelated to that interest (such as the loss of his job and his separation and transfer).  Plaintiff's protected property interest, and only that interest, "trigger[ed] the protections of the Due Process Clause."  544 F.3d at 291.  Since this is the interest protected by his procedural due process rights, his remedy for injuries caused by the deprivation of his due process rights must

be tailored to that interest.  *See Carey*, 435 U.S. at 258-59.[4]  Thus, the Court must ask this question:
if the hearing had not implicated Plaintiff's property interest in the security of his account (and
therefore Plaintiff had no entitlement to procedural due process protections) would the disciplinary
determination and its subsequent effects be upheld?  As is clear from this Court's decision on the
first set of motions for summary judgment, the Court believes the answer is yes.

This reading accords with the Third Circuit's reasoning that "Burns' injury was therefore
complete at the time that his account was originally assessed if we assume that (1) the Department
of Corrections impaired a cognizable property interest by virtue of the assessment and (2) the
disciplinary process failed to afford him sufficient process."  544 F.3d at 284.  The Third Circuit did
not attribute Burns' injury, if any, solely to the failure to afford him due process, but instead tethered
this injury to the impairment of the specific property interest that invoked due process protections.
This interpretation is reinforced by the next paragraph of the Third Circuit's opinion, which
discussed the possible damages Plaintiff might be entitled to if a violation of due process were
proven.   The Third Circuit discussed possible damages ranging from a nominal award to
"compensation for the time that his inmate account operated under a cloud."  *Id.*  Damages related
to lost wages or Plaintiff's transfer are not referenced.

Our application of *Carey* to the instant case also accords with the interpretations offered by
other courts.  *See Rosenstein v. City of Dallas, Tex.*, 876 F.2d 392, 397 (5th Cir. 1989) (finding that,
when only liberty interest was implicated, Plaintiff was not entitled to damages related to loss of his
job, in which he did not have property interest); *Doe v. District of Columbia*,  697 F.2d 1115, 1123

---

[4]  This provides an additional basis for denying Plaintiff's requests for lost wages and
damages related to his transfer.

(D.C. Cir. 1983) (holding that *Carey's* "general assertion that constitutional rights protect particular interests and are to be valued solely by reference to those interests is transferrable to the Bivens context"). As the Third Circuit declared, the assessment of Burns' account triggered procedural due process protections. Those protections, however, were aimed only at the specific property interest that triggered them. Accordingly, only those portions of the relief directly related to the specific property interest at issue in this case are available to Plaintiff upon remand.[5] Plaintiff's requests for injunctive relief (requests five through eight) are unavailable. The sixth through eighth requests, which deal with Plaintiff's separation order, transfer and change in security classification, bear no relation to his protected property interest. Plaintiff's disciplinary conviction, which he asks to have expunged in the fifth request, remains valid to the extent that it does not affect his property interest.

Only two requests for relief remain. Plaintiff's first request seeks a declaration that "the DOC policy governing disciplinary hearings violates minimum due process rights." Plaintiff contends that the DOC policy, as written, violates due process "because it grants a hearing examiner unbounded discretion to exclude witnesses called to testify by an inmate facing disciplinary charges." (Pl.'s Second Mem. at 18.) According to Plaintiff, because the Supreme Court has limited the constitutionally permissible grounds for denying an inmate's requested witness, the DOC's policy,

---

[5] This narrow reading of the relief that remains available to Plaintiff also conforms with the Prison Litigation Reform Act, which states:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C.A. § 3626 (2009).

which does not expressly outline acceptable reasons for denying a request, violates due process and grants limitless discretion.  This argument seemingly assumes that the DOC policy purports to supplant the Supreme Court's instructions.  However, this Court finds that the policy can easily be read to comport with the relevant constitutional doctrine, merely speaking specifically to the need for a written record of the reason for denying a witness request.  Moreover, DC-ADM 801 also applies to prison disciplinary proceedings in which no protected property or liberty interest is implicated and an inmate therefore is not entitled to due process.  As such, it would be inappropriate for the Court to declare that the policy, as written, violates due process.  Plaintiff's second request, for a declaration that the specific proceedings that Plaintiff was subjected to violated his procedural due process rights, is an appropriate remedy to be considered by the Court.  However, any such declaration, if warranted, must be limited to the extent to which those proceedings affected Plaintiff's protected property interest.

3.  *The standard governing requests for declaratory judgment*

Declaratory judgments are governed by 28 U.S.C. § 2201, which states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (2009).  District courts possess discretion to grant declaratory relief.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) ("Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.").  Whether a declaratory judgment should be granted partly depends upon the remedy's usefulness, an assessment particularly within the district court's ken.  *Id.* at 289.

4.    *Plaintiff's disciplinary proceedings*

In determining what process Plaintiff was due before his prison account could be assessed,

the Court takes as its starting point the Third Circuit's brief analysis of this issue:

> For purposes of this appeal, the only question we need address is whether the
> government has deprived Burns of a property interest; we answer that question in the
> affirmative. The amount of process an inmate is "due" is a distinct inquiry, and we
> agree that it must be informed by the Supreme Court's instruction in *Sandin* to
> "afford appropriate deference and flexibility to state officials trying to manage a
> volatile environment" and limit "the involvement of federal courts in the day-to-day
> management of prisons." *Sandin*, 515 U.S at 482, 115 S.Ct. 2293. As the Supreme
> Court instructed in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935
> (1974), "(t)he very nature of due process negates any concept of inflexible procedures
> universally applicable to every imaginable situation." *Id.* at 560, 94 S.Ct. 2963
> (quotation omitted). As such, "consideration of what procedures due process may
> require under any given set of circumstances must begin with a determination of the
> precise nature of the government function involved as well as of the private interest
> that has been affected by governmental action." *Id.*

*Burns*, 544 F.3d at 290 n.8; *see also Hale v. Beard*, 168 F. App'x 532, 534 (3d Cir. 2006)

("Traditionally, in assessing a procedural due process claim, we will balance the private interest, the

governmental interest, and the value of the available procedure in safeguarding against an erroneous

deprivation of property.") (citing *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 421 (3d

Cir. 2000)); *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997) ("The procedural protections

required by the Due Process Clause are determined with reference to the particular rights and

interests at stake in a case.").

Defendants contend that, given the seemingly attenuated nature of the property right

identified by the Third Circuit, the "Plaintiff's private interests here are minimal." (Defs.' Second

Mem. at 12.)  In contrast, Defendants assert that the government's interest is strong, because holding

inmates responsible for medical costs can deter assaults and promote prison safety.  The policy also

assists in deferring the costs of inmate medical care.  (*Id.* at 12-13.)  Plaintiff fails to engage in this analysis, and only references it in a footnote, stating that "[f]or reasons that are not clear, the defendants also engage in a balancing exercise . . . ."  (Pl.'s Opp'n. at 10 n.9.)  Instead, Plaintiff contends that "[t]he unexecuted assessment of his inmate account serves simply as a predicate, the occurrence of which triggered the protection of procedural due process."  (*Id.* at 9.)  The assessment of Plaintiff's account does more than merely trigger an amorphous conception of due process rights, it instead, as "the private interest affected by governmental action," molds consideration of the specific procedures due process demands in Plaintiff's particular circumstance.  *See Wolff*, 418 U.S. at 560 (*cited in Burns v. PA Dept. of Correction*, 544 F.3d at 290).  Given this analytical framework, Plaintiff's references to "the minimal due process rights afforded to prison inmates" are meaningless absent careful consideration of the specific interests that entitle him to these due process rights.  (*See* Pl.'s Second Mem. at 12.)

*Wolff v. McDonnell*, 418 U.S. 539 (1974), frames the analysis of the due process protections to which Burns was entitled.  In *Wolff*, an inmate brought a class action challenging the disciplinary process in a Nebraska prison. He alleged that the prison's procedures, which could result in the taking of good time credits, and thus the possible impairment of a liberty interest, "violated the Due Process clause of the Fourteenth Amendment."  *Id.* at 553.  The Court stated that in order to satisfy the "minimum requirements of procedural due process" a prisoner, who faced the loss of good time credits, must receive "advance written notice of the claimed violation and a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken."  *Id.* at 563.  The Court also declared itself to be "of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense

18

when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566; *see also Macia v. Williamson*, 219 F. App'x 229, 233 (3d Cir. 2007) (identifying these as procedural protections required by *Wolff* in context of prison disciplinary proceeding in which prisoner's good-time credit is at stake).[6]

The newly recognized property interest at issue here – the security of a prisoner's account – is a less important private interest than the good time credits at issue in *Wolff*. As the Supreme Court has declared, "the loss of [good time] credits threatens [a prisoner's] prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credits is not imposed arbitrarily." *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985) (citation omitted). The reduction in the economic value of Burns' institutional account[7] and the threat of appropriation, although it lasted three years, was so minor that the Court must conclude that this is a less weighty interest than a possible extension of

---

[6]  Plaintiff relies on *Young v. Kann*, 926 F.2d 1396 (3d Cir. 1991). As in *Wolff*, the Plaintiff in *Young* brought due process claims predicated on the loss of good time credit. The court expressly declared that *Wolff* held "that a prisoner has a constitutionally protected liberty interest in good time credit, and it enumerate[d] what due process requires when a prison disciplinary hearing may result in loss of such credit." *Id.* at 1399. This statement provides further support for the conclusion that the parameters of due process are defined by the interest at stake.

[7]  Had Burns' account actually been assessed, the maximum amount for which he could have been liable was $10.00, the total cost of the care provided to Mobley. (Joint Ex. 45 [Decl. of Myron Stanishefski] at ¶ 5.) However, considering the effect of this potential seizure on the present day economic value of Burns' property necessitates that this amount be discounted based on the probability of seizure. *See Burns*, 544 F.3d at 289-90. Although the Court will not attempt to calculate this probability, it can conclude that – to the extent the impairment of Plaintiff's property interest in the security of his account can be quantified – its value is no more than $10.00 and potentially less.

the term of imprisonment.  The Court bears this in mind as it analyzes the procedural protections outlined in *Wolff* and related cases.

>        a.        *Plaintiff was not denied the right to call witnesses.*

The parties do not dispute that Plaintiff received both written notice of the claimed violation and a written statement of the evidence relied upon and the reasons for the disciplinary action. Plaintiff contends, however, that he was denied the right to call witnesses.  Plaintiff made a timely request for Mobley to testify and was informed that Mobley refused to testify.  (Pl.'s Second Mem. at 17.)  Plaintiff claims, however, that the hearing officer violated Plaintiff's due process right to call witnesses by failing to direct or compel Mobley to testify or to obtain his testimony "through alternative means."  (*Id.* 18.)  Assuming *arguendo* that the property interest at stake here gives rise to a right to call witnesses, Plaintiff points to no authority within this Circuit that supports the proposition that a hearing officer's failure to obtain the testimony of an unwilling witness constitutes a due process violation.  When told by Mobley that he did not want to testify at the hearing, Canino, the hearing officer, asked if he would testify *in camera*; Mobley again refused.  (Joint Ex. 3 [Canino Dep.] at 60:9-15.)  Canino believed that Mobley did not want to testify out of fear of retaliation, a conclusion the Court finds reasonable given that Mobley was the individual assaulted.  (*Id.* at 85:12-21.)  In *Wolff* the Supreme Court declared that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal . . . ."  *Wolff*, 418 U.S. at 566.  This discretion, in the Court's opinion, extends from the refusal to call a witness to a hearing officer's acceptance of an inmate's refusal to testify.

Moreover, the cases Plaintiff cites from other circuits are distinguishable.  *Hoskins v. McBride*, 13 F. App'x 365 (7th Cir. 2001), dealt with the propriety of a hearing officer's exclusion

of existing witness statements, a distinct scenario from the one here.  In *Forbes v. Trigg*, 976 F.2d 308 (7th Cir. 1992), the court rejected a policy "allowing correctional officials complete discretion to appear at disciplinary hearings."  *Id.* at 316.  *Forbes* focused on regulations permitting only voluntary witnesses or categorically barring certain classes of witnesses, at the expense of "a case-by-case analysis of the calling of involuntary witnesses."  *Id.* at 317; *see also Brown v. Braxton*, 373 F.3d 501, 507 (4th Cir. 2004) (analyzing distinctions in witness request regulations).  In this case, the hearing officer did not simply rely upon a regulation; she instead reasonably exercised her discretion in accepting the refusal to testify of a witness who was the victim in the underlying action.

> b.  *Plaintiff was not unconstitutionally denied access to exculpatory evidence, nor was he denied the right to present documentary evidence.*

Plaintiff's second claim for relief asserts that Dohman and Canino failed to disclose exculpatory evidence by failing to permit Plaintiff to view requested videotapes and failing to disclose evidence regarding Mobley's identification of another inmate as the assailant.  Plaintiff's third claim for relief alleges that he was denied the right to present documentary evidence, including the videotape and other evidence, such as prison logs, incident reports, and evidence that Mobley identified another inmate.  Defendants move for summary judgment on these claims, but Plaintiff does not, on the grounds that these claims involve disputed facts and as such are not suitable for resolution on summary judgment.

Plaintiff, relying on *Young*, contends that the due process requirements outlined in *Wolff* include "a *Brady*-type right to the disclosure of exculpatory evidence in advance of a disciplinary hearing."  (Pl.'s Opp'n at 16 (citing *Young*, 926 F.2d at 1403)).  The situations in *Young*, and in the case upon which it relies, *Chavis v. Rowe*, 643 F.2d 1281 (7th Cir. 1981), are quite distinct from this

case.  In *Chavis* the Seventh Circuit held that a prisoner was denied the due process protections mandated by *Wolff* when the disciplinary committee denied access to exculpatory witness statements in an investigatory report.  *Id.* at 1286-87.  Importantly, however, the report was considered by the disciplinary committee in the process of reaching its conclusions.  As such, the court noted that the prisoner, if given this material, may have been able to incorporate it into his arguments before the Committee, thereby affecting their consideration of the material.  *Id.* at 1286.  Similarly, in *Young* an inmate sought access to a letter, in which he allegedly threatened his cellmate, that served as part of the basis for his disciplinary charge.  926 F.2d at 1397.[8]  Unlike these cases, there is no indication, nor any claim by Plaintiff, that the materials sought here were relied upon by the hearing officer in making her determination.  Given this important factual distinction, the Court is unwilling to extend the protections of *Wolff* to mandate access to the video, which was not relied upon by the hearing officer.  Nor will the Court extend *Wolff* to hold that prison officials were required to disclose to Plaintiff evidence regarding Mobley's prior identification of another inmate.  In making this decision, the Court is mindful of the Third Circuit's recognition that "while prisoners retain certain basic constitutional rights, including the protections of the due process clause, prison disciplinary hearings are not part of criminal prosecution, and inmates' rights at such hearings may be curtailed by the demands and realities of the prison environment."  *Young*, 926 F.2d at 1399 (citing *Wolff*, 418 U.S. at 555-56).

Wolff did hold that a prisoner facing a disciplinary hearing, in the context of a possible taking of good time credits, possesses the right to "present documentary evidence in his defense when

---

[8]  In the third case relied upon by Plaintiff, *Piggie v. Cotton*, 344 F.3d 674 (7th Cir. 2003) (per curiam), the prisoner also sought access to a video considered by the hearing officers in making their determination.

permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566; *see also Macia*, 219 F. App'x at 233.  However, the Court noted that in providing an inmate access to "relevant documentary evidence . . . we must balance the inmate's interest . . . against the needs of the prison, and some amount of flexibility and accommodation is required." 418 U.S. at 566.  Prison officials must maintain "necessary discretion . . . to limit access to other inmates to collect statements or to compile other documentary evidence."  *Id.*  The Court identified "irrelevance" as a possible reason for refusing to call a witness.  *Id.*  Although it was directed specifically to the calling of witnesses, this statement fell within a broader discussion of a prison official's discretion to permit witnesses and documentary evidence.  As such, irrelevance also provides an adequate reason for refusing access to documentary evidence.  Furthermore, the inmate's interest in *Wolff*, avoiding a loss of good time credits, was, as noted above, stronger than the security interest here.

Plaintiff relies on *Piggie v. McBride*, 277 F.3d 922 (7th Cir. 2002), in which the Seventh Circuit addressed whether a prison disciplinary board violated the procedural due process rights of an inmate facing a reduction in good time credits when the board "refus[ed] to view, or permit [the inmate] access to, the surveillance tape that he says would have exculpated him." *Id*. at 924.  *Piggie* recognized that "*Wolff* does not . . . guarantee prisoners the unfettered right to call any witness or present any evidence they wish regardless of its relevance or necessity."  *Id.*  The court held that, while *Wolff* did not guarantee access to the videotape, the board could not arbitrarily refuse to consider exculpatory evidence.  *Id.*  A disciplinary board can deny a request, although it bears the ultimate burden of showing its denial was not arbitrary or capricious.  *Id.* at 925 (citing *Ponte v. Real*, 471 U.S. 491, 498-99 (1985)).

23

In this case, Plaintiff asked to view, or have the hearing officer view, a copy of the surveillance video.  Plaintiff claims to have initially been told by Dohman that the alleged assault was recorded on video.  (Joint Ex. 1 [Burns Dep.] at 16:2-6.)  Canino, in response to Plaintiff's request, asked Dohman about the existence of the video and was told, during an *in camera* hearing, that the incident had not been recorded.  (Canino Dep. at 51:6-54:4.)[9]  Canino denied Plaintiff's request, noting in her report that no recording existed.  (Joint Ex. 24 [Disciplinary Hr'g Report].)  Given the deference and flexibility owed to prison hearing officials, and the minimal property interest at issue here, the Court is reluctant to mandate that a hearing officer must independently review all potentially relevant video evidence when an inmate claims he was told an incident was recorded.  Moreover, since the Court finds, *infra*, that other components of the disciplinary hearing did violate procedural due process, a definitive declaration that procedural due process requires that the hearing officer independently review the video would not alter the relief the Court affords Plaintiff.  *See Sandin*, 515 U.S. 482 (lamenting how prior cases "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone.").

        c.    *The record is insufficient to establish that the hearing officer independently assessed the reliability and credibility of the confidential informants.*

Plaintiff also contends that his due process rights were violated by the hearing officer's reliance on the statements of two unnamed confidential informants, which were conveyed to her in

---

[9]  Canino is unable to remember whether she was told that no tape existed or that the tape did not record the incident, or whether she viewed the taped herself and saw that the incident was not caught by the camera.  (Canino Dep. at 51:6-54:4.)  According to Dohman's testimony, videotapes are reused by the prison every other month, so the relevant recording would no longer exist.  (Joint Ex. 2 [Dohman Dep.] at 48:4-17; 50:16-51:11.)

an oral summary by Dohman.  The hearing officer did not interview the confidential informants, receive or request written testimony from them, or inquire regarding their identities.  In her deposition she did, however, claim that Dohman described, in general terms, information the informants had given in the past that indicated they were reliable and that Dohman told her where the informants were positioned when they observed the assault.  (Canino Dep. at 39-42; Dohman Dep. at 69-73.)  Canino acknowledged that absent Dohman's recounting of the confidential informants' testimony she would not have found Plaintiff guilty and that there was no additional information she relied upon in making her determination.  (Canino Dep. at 74-75.)

Defendants dispute Plaintiff's statement of fact that "In finding Burns guilty, Canino relied solely on Dohman's hearsay testimony summarizing the statements of two unnamed confidential informants."  (Mem. of Law in Supp. of Defs.' Resp. to Pl.'s Second Mot. for Partial Summ. J. at 4.)  Defendants contend that Canino's deposition reveals additional bases for her finding of guilt. In response to a question regarding what evidence, in addition to Dohman's summary of the confidential informants' statements, she relied upon in making her determination, Canino responded: "The misconduct report, the report from the CSIs, and the medical reports.  And the photos, I looked at those." (Canino Dep. at 66:14-16.)  When asked whether her determination of the credibility of the confidential informants was "based solely on what Captain Dohman told you," she responded that she also considered "how inmate Burns conducted himself during his interview with me." (Canino Dep. 81:12-16.)

It is unclear to the Court how the Plaintiff's behavior during his interview with the hearing officer could aid in the determination of the credibility of two unknown confidential informants.  Nor is it clear how the medical reports and photos would indicate who caused Mobley's injuries.  Hence

the Court must conclude that the only evidence Canino relied upon was Dohman's oral summary of the confidential informants' accounts of the incident and the misconduct report filed by Dohman, which in turn relied on these informants' accounts and the claim that "Lt. Ansari also was informed that you committed the assault by other inmates."  (Joint Ex. 19 [Misconduct Report].)

Plaintiff analogizes his case to the facts in *Helms v. Hewitt*, in which the Third Circuit held that an inmate "suffered a denial of due process by being convicted on a misconduct charge when the only evidence offered against him was a hearsay recital, by the charging officer, of an uncorroborated report of an unidentified informant."  655 F.2d 487, 502 (3d Cir. 1981), *rev'd on other grounds*, 459 U.S. 460 (1983), *aff'd in relevant part on remand*, 712 F.2d 48, 49 (3d Cir. 1983).  In *Helms*, the investigating officer had received a notarized affidavit from the informant.  The Third Circuit concluded that "Under the tensions and strains of prison living fraught with intense personal antagonisms, determination of guilt solely on an investigating officer's secondary report of what an unidentified informant advised him, albeit by affidavit, invites disciplinary sanctions on the basis of trumped up charges."  *Helms*, 655 F.2d at 502.  Such a determination, absent any "primary evidence of guilt in the form of witness statements, oral or written, or any form of corroborative evidence, amounts to a determination on the blind acceptance of the prison officer's statement.  Such a practice is unacceptable . . . ." *Id.*  Although the *Helms* court acknowledged the useful role hearsay may play in the context of prison disciplinary proceedings, it concluded that allowing a prison tribunal to rely upon "mere conclusory representations" would severely hamper the tribunal's "task as a factfinder . . . to evaluate credibility and assess reliability of the evidence presented . . . ." *Id.*  In order to provide minimum due process, a disciplinary determination, when based upon the statement of an unidentified informant, must follow this procedure:

26

> (1) [T]he record must contain some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable; (2) the record must contain the informant's statement [written or as reported] in language that is factual rather than conclusionary and must establish by its specificity that the informant spoke with personal knowledge of the matters contained in such statement.

*Id.* (quoting *Gomes v. Travisono*, 510 F.2d 537, 540 (1st Cir. 1974) (alterations in original)).   In

*Helms* the court found that the investigating officer's "testimony before the [hearing] committee, as

characterized in the affidavits before us, contained absolutely no indicia of reliability imputable to

the alleged undisclosed informant."  *Id.* at 502.   While the officer claimed the informant had

provided reliable and corroborating evidence in the past, none of this information, which the hearing

committee may have used to judge the informant's credibility, was made known to the committee,

resulting in a denial of due process.  *Id*.

The record in this case, regarding what information Canino relied upon in reaching an

independent assessment of the confidential informant's credibility, is ambiguous.   Canino's

Disciplinary Hearing Report states that she held an *in camera* hearing with Dohman:

> to determine the reliability of the (2) CSI's used in his Report, Capt. Dohman gave a preponderance of evidence to my satisfaction that the informants were in a position to observe the incident and have corroborated each others statements and have been given [sic] him information proven reliable in the past.  The Capt. advised me where the informants were and how they corroborated each other.   What information was proven reliable in the past and how.   The reliability hearing was conducted in camera because the reliability evidence could by itself reveal the identity of the (2) CSI's.

(Disciplinary Hr'g Report at 1.)   In his deposition, Dohman elaborated on the information he

conveyed to Canino regarding the confidential informants.   His statements contradict Canino's

report, as he expressly states that he did not tell Canino the specific position from which either

confidential informant observed the incident, but instead "told her that they were in a position to see

27

the assault." (Dohman Dep. at 72:6-13, 73:7-11.)  He also explained that the only information he

gave Canino regarding the credibility of the informants, was that "both had given me information

[in the past] concerning drugs and staff."  (*Id.* at 76:14-21.)  His testimony indicates he did not

provide information regarding specific facts or prior incidents that would support an independent

finding that the informants were credible and reliable, instead he offered mere conclusory statements.

(*Id.* 72:20-73:6.)  Nonetheless, Canino's deposition testimony indicates, albeit with some ambiguity

and hesitation, that she asked for and received more detailed information from Dohman.  With

regards to information pertaining to the inmate's location she testified:

> Q. Now, did Captain Dohman tell you specifically where [the informants] were - -
> A. Yes.
>     MR. BRADFORD: Let him finish the question.
> A. Sorry.  Go ahead.
> Q. So he told you where the inmates were positioned?
> A. It says right here [referencing Disciplinary Hearing Report].  Wait a minute.  Let me see.
>   Let me read this here.
>     "The informants were in a position to observe."
>   I asked Captain Dohman could you tell me where CSI 1 was, and then he will tell me.
>   "Can you tell me where CSI 2 was?"  I must have asked him that question.
> Q. So you do get the specific location.  It is not just he says they were in a position - -
> A. I must find out where they were.
> Q. And he gave you specific information as far as what they observed or had personal
> knowledge about?
> A. If I wrote the man was in Cell 14 - - over by the soda machine, that could identify the CSI.
> Q. I understand.
> A. I can't say he had red hair and he - - I can't do that.
> Q. But Captain Dohman would have given you that sort of information?
> A. Yes.
> Q. You just would not have written it down in this report?
> A. Captain Dohman cannot - - I don't write down anything about the CSIs other than he tells
>   me what happened.

(Canino Dep. at 39:9-40:21.)

In reference to their reliability and information provided in the past, Canino testified:

> Q. You also indicate [in the Report] that information from these two CSIs has proven reliable in the past?
> A. Yes.
> Q. How did you come to that conclusion?
> A. I asked Captain Dohman what information have they given in the past. And Captain Dohman will say there was a drug-related incident, not in this case, another case or whatever, whatever it was.
> Q. As an example then?
> A. I don't say what is the inmate's name and who did he give information on. There was a drug bust, they found whatever. I don't know.
> Q. But you are giving that as a hypothetical example now. Do you remember what he told you?
> A. I don't recall this incident at all. I don't recall it.

(*Id.* at 41:24-42:19.) Given the deposition testimony of Dohman and Canino, read in conjunction with the Disciplinary Report, the Court finds there is insufficient information to determine whether the hearing record, including what was produced in camera, "contain[ed] some underlying factual information from which the [tribunal] can reasonably conclude that the informant was credible or his information reliable." *Helms*, 655 F.2d at 502. In resolving this issue, the Court draws instruction from *Hensley v. Wilson*, 850 F.2d 269 (6th Cir. 1988), which the Third Circuit cited approvingly in *Young v. Kann*, 926 F.2d at 1402. In *Hensley* the Sixth Circuit held that "a prison disciplinary committee, relying substantially upon information supplied by confidential informants when ordering the forfeiture of an accused prisoner's good time, must make an independent assessment of the informant's reliability and a contemporaneous record of that assessment." 850 F.2d at 271. This record need not "be a public record accessible to the charged inmates when prison security interests are involved." *Id.* The Court finds particularly persuasive the Sixth Circuit's analysis of the value of preserving a record of the independent assessment of reliability:

> To accommodate the prison's informant system, the inmates' interest in full disclosure of the evidence against them and the identity of their accusers must be sacrificed. However, this does not mean, as defendants initially contended below,

29

> that this information need never be recorded and that the committee has no obligation
> to explain the basis for disciplinary action any more fully than it has in its scanty
> public record.  Inmates still have a substantial interest in obtaining judicial review of
> disciplinary actions, and there is no reason why information that must be kept from
> the inmates may not be preserved for the courts.

*Hensley*, 850 F.2d at 279.  The Sixth Circuit even proceeded to declare that due process required a

contemporaneous record of the evidence relied upon in determining reliability.  *Id.* at 283.

The record in this case confirms that Canino, who has little recollection of this specifics of

this hearing, did not make "a contemporaneous record of the assessment [of informant credibility]."

This failure renders it impossible for this Court to undertake a review comparable to that performed

by the Third Circuit in *Henderson v. Carlson*, 812 F.2d 874 (3d Cir. 1987).  In *Henderson* the court

held "that a prison disciplinary committee need not reveal at a disciplinary hearing evidence bearing

on the reliability of confidential informants if prison officials believe that such evidence is capable

of revealing the identity of the informants and if the evidence is made available to the court for *in

camera* review."  *Id.* at 880.  The Third Circuit proceeded to perform an *in camera* review of the

confidential investigative report.  Since no such review is possible here, the Court makes the narrow

declaration that, as to the assessment of Plaintiff's prison account *only*, the disciplinary record lacks

sufficient evidence for the Court to conclude that Canino independently assessed the credibility of

the confidential informants and that Plaintiff received the procedural due process to which that

protected property right entitled him.  Canino's failure to independently assess the reliability and

credibility of the confidential informants whose testimony she relied upon in assessing Plaintiff's

inmate account violated the procedural due process rights Plaintiff was entitled to given his protected

property interest in the security of his inmate account.   The process provided to date is insufficient

should the prison seek to reinstate the sanction of assessing Plaintiff's inmate account. Whatever cloud of unknowing lingers over Plaintiff's account is now lifted.

### C.    Plaintiff's Due Process Rights on Appeal

Plaintiff contends that Bitner, DiGuglielmo, Wolfe, Hosband, and Regan violated his due process rights by failing "to investigate and challenge on administrative appeal the facially defective procedures utilized by the hearing examiner." (Pl.'s Second Mem. at 19.) However, given that the Third Circuit's novel ruling recognized a new property interest, in the absence of which the Plaintiff had no claim to procedural due process protections, the Court does not agree that a "procedural violation [was] apparent on the face of documents submitted to reviewing officials on appeal." (*Id.* (citing *King v. Cuyler*, 541 F. Supp. 1230, 1234 (E.D. Pa. 1982).) Moreover, to find that such a violation was apparent would be inconsistent with the Court's finding of qualified immunity. Plaintiff's due process rights were not violated by the reviewing officials.

### IV.    CONCLUSION

The Third Circuit has determined that Plaintiff has a right to security in his inmate account. This right entitles him to limited due process protections. Qualified immunity further restricts the relief available to him. The Court concludes that the only relief to which Plaintiff is entitled is the narrow declaratory relief outlined above. An appropriate Order will be docketed with this Memorandum.